UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:26-CV-00848-MEO

| | |
|---|---|
| WALTER ALFREDO SAMAYOA CORADO, a/k/a CAROL SOFIA SAMAYOA CORADO,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN, et al.<br><br>Respondents. | <u>MEMORANDUM & ORDER</u> |

**THIS MATTER** is before the Court on Petitioner Samayoa Corado's Petition for Writ of Habeas Corpus (Doc. No. 1) and Emergency Motion for Temporary Restraining Order/Preliminary Injunction (Doc. No. 10). The Court heard arguments on these filings on November 18, 2026. For the reasons set forth below, the Court will deny the Petition and deny as moot the Emergency Motion for Temporary Restraining Order/Preliminary Injunction.

## I. BACKGROUND

The following facts are drawn from the Petition and the parties' exhibits to their briefing of the Emergency Motion for Temporary Restraining Order/Preliminary Injunction. They are largely undisputed.

Petitioner is a native and citizen of Guatemala. Petitioner entered the United States without inspection in or near Eagle Pass, Texas, on or about May 21, 2023. (Doc. Nos. 1 ¶ 1; 14-2 at 2). According to Department of Homeland Security ("DHS") records, Border Patrol encountered and arrested Petitioner near the border on or

about May 23, 2023. (Doc. No. 14-2 at 2). At the November 18 hearing, Petitioner's counsel stated that Petitioner was apprehended within hours of entry. Whether hours or two days, the record establishes that Petitioner was apprehended at or near the border shortly after crossing. Respondents issued a Form I-860, Notice and Order of Expedited Removal, and placed Petitioner in expedited removal under 8 U.S.C. § 1225(b)(1). (Doc. No. 14-3). Petitioner does not dispute that § 1225(b)(1) applied at the time of the initial detention.

Shortly after being detained and placed into expedited removal proceedings, Petitioner expressed a fear of returning to Guatemala. (Doc. No. 1 ¶ 2). Following an interview on June 6, 2023, an asylum officer made a positive credible-fear determination. *Id.* ¶ 27; *see also* (Doc. No. 14-4 ¶¶ 6–7). On June 14, 2023, DHS issued a Notice to Appear ("NTA") placing Petitioner in removal proceedings under 8 U.S.C. § 1229a. The NTA does not identify Petitioner as an "arriving alien." Instead, it classifies Petitioner as an "alien present in the United States who has not been admitted or paroled." (Doc. No. 2-2 at 2); *see also* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled . . . is inadmissible.").

Thereafter, on June 21, 2023, Immigration and Customs Enforcement ("ICE") officials released Petitioner under 8 U.S.C. § 1182(d)(5)(A), a statutory provision that authorizes discretionary humanitarian parole. *See* (Doc. No. 2-3 at 4). This is a temporary status: when its humanitarian purpose has been accomplished, "the alien shall forthwith return or be returned to the custody from which he was paroled and

thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

Upon release from custody, Petitioner was provided written notice that parole was "pending a final decision in [an] exclusion/deportation hearing." (Doc. No. 2-3 at 3). This document also explained:

> Your parole authorization is valid for one year . . . and will automatically terminate unless ICE provides you with an extension at its discretion. ICE may also terminate parole on notice prior to the automatic termination date. Parole is within ICE's discretion and can be terminated at any time and for any reason.

*Id.* at 4. Petitioner's parole terminated by its terms on June 21, 2024, one year after issuance. Petitioner does not challenge that expiration. *See* (Doc. No. 1 ¶ 81). It is undisputed that the record reflects humanitarian reasons for the 2023 parole, including the risk of assault Petitioner faced in detention.

Petitioner moved to North Carolina and filed for asylum and withholding of removal on December 27, 2023, within the one-year deadline. *Id.* ¶¶ 36–37. That application remains pending. *See id.* ¶ 38. Petitioner obtained employment authorization, worked, paid taxes, and has no criminal record. *See id.* ¶¶ 41–45. Petitioner reported to ICE check-ins in October 2023, October 2024, and October 2025. *Id.* ¶ 39. The last two check-ins occurred after Petitioner's parole had expired. *Id.* ¶ 40. ICE did not detain Petitioner at either check-in. *See id.*

Then, on October 7, 2026, Petitioner reported to a scheduled check-in at the Charlotte ICE Field Sub-Office and was taken into custody. *Id.* ¶ 43. Petitioner filed the Petition the same day, while in custody in this District. *See id.* at 35. Respondents

assert that Petitioner is detained under 8 U.S.C. § 1225(b)(1)(B)(ii). *See* (Doc. No. 13 at 2).

Petitioner was transferred to the Stewart Detention Center in Lumpkin, Georgia, on October 8, 2026. (Doc. No. 14-4 ¶ 10). On October 26 and 27, 2026, another detainee sexually assaulted Petitioner during a work assignment in the facility's commissary. (Doc. No. 10-4 ¶¶ 23, 26–27, 29). Petitioner reported the assaults on October 27. *Id.* ¶ 30. The facility's investigation substantiated the allegations. (Doc. No. 14-4 ¶ 18). According to the Horrach Declaration, after Petitioner's report, the facility escorted Petitioner for a medical evaluation, provided information under the Prison Rape Elimination Act, offered mental health services, and conducted a mental health evaluation. *Id.* ¶ 16. The perpetrator was placed in administrative segregation and then moved to a different facility. *Id.* ¶ 17. Protective custody was offered on October 13, 2026, and remains available. *Id.* ¶¶ 14–19. Petitioner has declined protective custody, fearing it would mean isolation, which accompanied serious psychological impacts during the 2023 detention. *See id.* ¶ 14; (Doc. No. 10-4 ¶ 21). Petitioner reports anxiety, depression, sleep and appetite loss, and thoughts of self-harm. (Doc. No. 10-4 ¶¶ 16–17).

Petitioner seeks immediate release or, alternatively, a bond hearing within forty-eight hours at which Respondents bear the burden by clear and convincing evidence. *See* (Doc. Nos. 10-1 at 24–25; 17 at 17). Respondents move to dismiss under Rules 12(b)(1) and 12(b)(6). (Doc. No. 13 at 1).

## II. LEGAL STANDARD

The writ of habeas corpus "provide[s] a means of contesting the lawfulness of restraint and securing release." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 117 (2020). The federal judiciary does not have inherent authority to issue the writ; rather, the scope of its power depends entirely on statute. *Montgomery v. Louisiana*, 577 U.S. 190, 219 (2016) (Scalia, J., dissenting). Pursuant to 28 U.S.C. § 2241, the federal district courts "may" grant habeas relief to any person "within their respective jurisdictions" and "in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2241(a), (c)(3).

However, "the district court's discretion to entertain habeas petitions and exercise the power of the writ is not boundless." *Timms v. Johns*, 627 F.3d 525, 530 (4th Cir. 2010). Equitable considerations, "such as comity and the orderly administration of criminal justice," sometimes counsel against granting otherwise available habeas relief. *Id.* (quoting *Munaf v. Geren*, 553 U.S. 674, 693 (2008)). The reviewing court must be mindful that the writ of habeas corpus "is the avenue of last resort . . . . typically available only when the petitioner has no other remedy." *Id.* at 531 (citation modified).

## III. DISCUSSION

### A. Jurisdiction

The Court generally has jurisdiction under 28 U.S.C. § 2241 to determine whether a petitioner is "in custody in violation of the Constitution or laws . . . of the

United States." 28 U.S.C. § 2241(c)(3).[1] Respondents assert that 8 U.S.C. §§ 1252(a)(2)(A)(iv) and 1252(e)(3)(A) strip this Court of jurisdiction to review the Petition in this case. However, neither provision bars this proceeding.

Section 1252(a)(2)(A)(iv) generally bars judicial review of "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)." Here, Petitioner does not ask the Court to review a procedure or policy. Petitioner instead challenges the legality of the present custody. The Court's determination of which statute authorizes a particular detention is not review of a procedure or policy adopted to implement that statute. Respondents rely on *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), an adjudicative interpretation of § 1225(b)(1)(B)(ii). But that agency adjudication is not itself a procedure or policy adopted by the Attorney General. Nor does not bind this Court on the meaning of the statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). The Court construes § 1225(b)(1) for itself.

Moreover, the structure of the statute places § 1252(a)(2)(A) within a provision governing judicial review of removal orders. § 1252(a)(2)(A)'s clauses address the expedited removal order, the decision to invoke § 1225(b)(1), and the determinations made under § 1225(b)(1)(B). None of these scenarios apply to Petitioner. Petitioner is no longer subject to an expedited removal order. Instead, Petitioner is in removal proceedings under § 1229a.

---

[1] Petitioner was in custody in this District when the Petition was filed on October 7, 2026. Petitioner's later transfer to Georgia does not defeat jurisdiction that attached at filing. *See Rumsfeld v. Padilla*, 542 U.S. 426, 440–41 (2004); *Ex parte Endo*, 323 U.S. 283, 304–07 (1944).

Congress may restrict habeas review of such a claim only by a clear statement, and where an alternative reading is "fairly possible," courts must adopt it. *I.N.S. v. St. Cyr*, 533 U.S. 289, 298–305 (2001). Section 1252(a)(2)(A) contains no such statement. It is naturally read as reaching challenges to the expedited removal order itself, not a challenge to the lawfulness of Petitioner's detention. A contrary interpretation would raise a serious constitutional question under the Suspension Clause. *See* U.S. Const. art. I, § 9, cl. 2.[2]

At the hearing, the Court asked Respondents whether any Supreme Court or Fourth Circuit decision supports their jurisdictional position. Counsel identified none. The Court concludes that it has jurisdiction to decide the Motion.[3]

**B. Statutory Authority**

Having determined that jurisdiction exists, the Court now turns to the merits of this case. Both parties agree Petitioner was originally subject to mandatory detention in 2023 pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii). Respondents argue that § 1225(b)(1)(B)(ii) still controls. Petitioner, on the other hand, asserts that Petitioner is now subject to 8 U.S.C. § 1226 and that Petitioner's detention without

---

[2] Likewise, Respondents' reliance on Section 1252(e)(3)(A) is misplaced. Section 1252(e)(3)(A) funnels to the District of Columbia those challenges to the validity of the expedited removal system and addresses systemic challenges to the statute, regulations, and written policies. It does not reach an individual habeas petition challenging the lawfulness of one person's custody.

[3] Because the Court resolves the Motion on the merits, it need not decide whether Petitioner was required to seek a bond redetermination before an immigration judge. The Court notes that Respondents' position, consistent with *Matter of M-S-*, is that Petitioner is ineligible for bond.

individualized process violates the Fifth Amendment and 8 U.S.C. § 1226(a). As explained below, based on the plain language of the relevant statutes, the Court agrees with Respondents.

*1. The Text*

Judicial interpretation begins with the statutory text. *Lopez v. Bondi*, 167 F.4th 223, 232 (4th Cir. 2026). Three provisions are relevant to the Court's consideration.

First, § 1225(b)(1)(B)(ii) provides: "If the officer determines at the time of the interview that an alien has a credible fear of persecution . . . the alien shall be detained for further consideration of the application for asylum." The word "shall" imposes a mandatory duty. The duration of the detention is not spelled out in terms of a specific time period other than stating that it is "for further consideration of the application for asylum."

Second, § 1182(d)(5)(A) authorizes the Secretary of Homeland Security to temporarily "parole into the United States," "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," an "alien applying for admission." The same sentence provides that "such parole of such alien shall not be regarded as an admission" to the United States. *Id.* It continues: "[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

Third, § 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." An alien arrested under this statute may be released on bond or conditional parole. *Id.* § 1226(a)(2).

Read together, these provisions operate as follows. Petitioner was detained under § 1225(b)(1)(B)(ii) after a positive credible-fear determination. Petitioner was paroled out of that custody under § 1182(d)(5)(A). As set forth in the statute, that parole was not an admission. When the parole ended, the statute directs that the alien "return or be returned to the custody from which he was paroled . . . ." 8 U.S.C. § 1182(d)(5)(A). That custody is § 1225(b)(1)(B)(ii) custody. Consideration of Petitioner's application for asylum is ongoing. The "shall be detained" mandate of § 1225(b)(1)(B)(ii) therefore applies.

The Supreme Court's decision in *Jennings v. Rodriguez*, 583 U.S. 281 (2018) further supports this reading of the text. As the *Jennings* Court explained:

> Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded. Section 1225(b)(1) aliens are detained for "further consideration of the application for asylum," and § 1225(b)(2) aliens are in turn detained for "[removal] proceeding[s]." **Once those proceedings end, detention under § 1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any limit on the length of detention.** And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.

*Id.* at 297 (emphasis added). Accordingly, under the plain language of the statute, Petitioner remains subject to the mandatory detention requirements of § 1225(b)(1).

*Jennings* also forecloses Petitioner's argument, pressed at the hearing, that § 1225(b)(1) only applies at the commencement of the consideration of the asylum application, and that § 1225(b)(1) ceased to apply when Petitioner was placed in removal proceedings under § 1229a. As the Supreme Court explained, "§ 1225(b)(1) . . . mandate[s] detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." *Id.* at 302. A positive credible-fear determination triggers § 1225(b)(1)(B)(ii), and where, as here, a NTA is issued, the "further consideration of the application for asylum" that the statute contemplates occurs in § 1229a proceedings. *See* 8 C.F.R. § 208.30(f). Petitioner's placement in those proceedings therefore does not take Petitioner outside § 1225(b)(1)(B)(ii).

Petitioner's position finds some support in the text of § 1226(a), which reaches an alien detained "pending a decision on whether the alien is to be removed," and in the Board of Immigration Appeals' earlier view that an alien referred to removal proceedings after a positive credible-fear determination could seek bond. *See Matter of X-K-*, 23 I. & N. Dec. 731 (BIA 2005), *overruled by Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019). But agency interpretations do not bind this Court. *See Loper Bright*, 603 U.S. at 412–13. The question turns on the statutory text.

That text does not support the premise that the pendency of full removal proceedings, standing alone, places a detainee under § 1226(a). The adjacent provision of § 1225(b)(2)(A), governing other applicants for admission, confirms the point: such applicants "shall be detained for a proceeding under section 1229a of this

title." A pending § 1229a proceeding therefore does not distinguish § 1226(a) from § 1225(b). Where a general provision and a specific provision overlap, "[t]he terms of the specific authorization must be complied with." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Section 1225(b)(1)(B)(ii) speaks specifically to an alien in expedited removal who has received a positive credible-fear determination. Section 1226(a) speaks generally to aliens in removal proceedings. The specific provision controls.

Nor does detention "for further consideration of the application for asylum" end when the asylum claim is heard in a § 1229a proceeding alongside other issues. The asylum application is considered in that proceeding, and it remains pending there. Under the reasoning of *Jennings*, this statutory phrase encompasses the subsequent proceedings in which the application is considered, and detention ends when those proceedings end. 583 U.S. at 297.

### 2. *Petitioner's textual arguments*

The Court asked Petitioner's counsel at the hearing to identify the statutory text, or controlling case, that converts detention under § 1225 into detention under § 1226 after a period of time in the country. Counsel pointed to district court decisions. Those decisions do not identify a textual threshold, and the Court finds none. The Court addresses Petitioner's specific arguments in turn.

#### a. The "arriving alien" designation and the NTA

Petitioner argues that the "arriving alien" designation in 8 C.F.R. § 1.2 does not apply, and that the NTA charges Petitioner as present without admission or

parole. Both points are accurate. Neither takes Petitioner outside § 1225(b)(1). Expedited removal applies by its terms both to aliens "arriving in the United States" and to aliens designated under § 1225(b)(1)(A)(iii), who have not been admitted or paroled and cannot show two years of continuous presence. 8 U.S.C. § 1225(b)(1)(A)(i), (iii); *see* 8 C.F.R. § 235.3(b)(1)(ii). Petitioner was processed in expedited removal as a person who had entered without inspection and "who ha[d] not been admitted or paroled" under § 1225(b)(1)(A)(iii). (Doc. No. 14-5 at 1). Petitioner sought relief from removal, expressing an intention to apply for asylum or fear of persecution under § 1225(b)(1)(A)(ii), and was interviewed in connection with that asylum application on June 6, 2023, under § 1225(b)(1)(B). Section 1225(b)(1)(B)(ii) applies to Petitioner for that reason, not because of any arrival at a port of entry. The petitioner in *Matter of M-S-* had likewise entered without inspection. *See* 27 I. & N. Dec. at 514. Regardless, a charge in an NTA does not supply or alter the statutory authority for detention—Congress did.

b. A "dormant" command

Petitioner argues that nothing in § 1225(b)(1)(B)(ii) makes its detention command reactivate years later. (Doc. No. 1 ¶ 93). But § 1182(d)(5)(A) does. It directs that a parolee "shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). Congress expressly provided for the resumption of the original custody.

c. Case-by-case determination

Petitioner argues that § 1182(d)(5)(A) requires a case-by-case determination before re-detention. *Id.* The text does not say so. The phrase "only on a case-by-case basis" modifies the Secretary's authority to "temporarily parole." *Id.* It governs the grant of parole. It says nothing about the expiration of a parole granted for a fixed term. The word "temporarily" confirms that parole has a limited duration. The governing regulation provides that parole "shall be automatically terminated without written notice" at the expiration of the time for which it was authorized. 8 C.F.R. § 212.5(e)(1)(ii). Petitioner's parole was not revoked. It automatically terminated. And Petitioner does not challenge the automatic termination of the parole.

The regulation directs that a person whose parole has expired "shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required." *Id.* Paragraph (e)(2), in turn, provides that the person "shall be restored to the status that he or she had at the time of parole." *Id.* § 212.5(e)(2)(i). Petitioner's status at the time of parole was detention under § 1225(b)(1)(B)(ii). The regulation thus confirms what the statute requires. Paragraph (e)(2) also provides that the person "shall again be released on parole" if a removal order "cannot be executed within a reasonable time." 8 C.F.R. § 212.5(e)(2)(i). That provision does not apply here because Petitioner is not subject to a final order of removal. Nor does the regulation's text suggest that a delay in re-detention converts an automatic termination into a termination on notice. The regulation fixes termination "at the

expiration of the time for which parole was authorized," not at the time DHS acts. *Id.* § 212.5(e)(1).

Petitioner relies on *Pineda-Berrios v. Lyons* from the Eastern District of Virginia, which held that DHS "cannot simply tack on a one-year limitation to the grant of parole without considering [the parolee's] individualized circumstances." *Pineda-Berrios v. Lyons*, No. 1:25-CV-2332, 2026 WL 384159, at *6 (E.D. Va. Feb. 11, 2026), *appeal dismissed sub nom. Pineda-Berrios v. Venturella*, No. 26-6446, 2026 WL 3047184 (4th Cir. Sept. 18, 2026). The statute, however, authorizes the Secretary to parole an alien "temporarily under such conditions as he may prescribe." 8 U.S.C. § 1182(d)(5)(A). A fixed term of parole is such a condition, and the case-by-case determination the statute requires occurs when parole is granted.

Petitioner also invokes the clause directing return to custody "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5)(A). Some courts have read that clause to require an individualized determination before a parolee is returned to custody. *See, e.g., Sadat v. Noem*, 1:26-cv-773, 2026 WL 2905978, at *2 (E.D. Va. Sept. 28, 2026). The Court disagrees with that interpretation. That clause of § 1182(d)(5)(A) governs the termination of a term of parole that remains in effect. And for the reasons already explained, a fixed term of parole is a condition prescribed by the Secretary, and nothing in the plain language of the statute requires DHS to make individualized findings prior to the parole term's expiration. Petitioner's parole ended on its own terms on June 21, 2024, and its fixed term reflects the Secretary's judgment, made at

the grant, for how long the purposes of parole warranted release. The clause also commits that judgment to "the opinion of the Secretary." *Cf. Webster v. Doe*, 486 U.S. 592, 600 (1988) (statute authorizing termination whenever the Director "shall deem such termination necessary or advisable" committed the decision to agency discretion). In any event, a defect in how parole ended would not convert detention under § 1225(b)(1)(B)(ii) into detention under § 1226(a), and so would not entitle Petitioner to a bond hearing.

d. "Any other applicant for admission"

Petitioner argues that the final clause of § 1182(d)(5)(A)—that the parolee's case "shall continue to be dealt with in the same manner as that of any other applicant for admission"—together with *Lopez Garcia v. Guadian*, 190 F.4th 305 (4th Cir. 2026), places Petitioner in § 1226(a) because Petitioner is now an applicant for admission located in the interior. The structure of the statutory sentence defeats that reading. When parole ends, the statute provides that the parolee "shall forthwith return or be returned to the custody from which he was paroled *and thereafter* his case shall continue to be dealt with in the same manner as that of any other applicant for admission." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). The "shall continue" clause of § 1182(d)(5)(A) that Petitioner relies on thus describes what happens after an alien is "forthwith . . . returned" to his original custody. It does not supply a new source of detention authority. For Petitioner, that original custody is detention under § 1225(b)(1)(B)(ii). Further, Petitioner's argument assumes the entry fiction doctrine does not apply. As explained below, the Court finds it does.

e. Forbearance

Petitioner also contends that because of ICE's delay, the authority to detain had shifted to § 1226(a). However, the fact that ICE did not detain Petitioner at two check-ins after the parole expired does not change the statute. Agency inaction does not repeal a statutory mandate, and an agency's past practice cannot override plain statutory text. *See D.C. v. John R. Thompson Co.*, 346 U.S. 100, 113–14 (1953) ("The failure of the executive branch to enforce a law does not result in its modification or repeal."); *Louisville & N. R. Co. v. United States*, 282 U.S. 740, 759 (1931) ("A failure to enforce the law does not change it."). The statutory text does not support Petitioner's contention here.

*3.* Lopez Garcia *does not control*

Petitioner relies principally on *Lopez Garcia v. Guadian*, 190 F.4th 305 (4th Cir. 2026). The Court has studied that decision. *Lopez Garcia* does not decide this case for three reasons.

First, it construes a different statutory provision. *Lopez Garcia* addressed whether § 1225(b)(2)(A) or § 1226(a) governs the detention of certain noncitizens. Its analysis turned on the meaning of the phrase "seeking admission" in § 1225(b)(2)(A), which the majority read to describe active and ongoing efforts to enter. *See Lopez Garcia*, 190 F.4th at 320, 325–26. This case arises under § 1225(b)(1)(B)(ii). That provision does not contain the phrase "seeking admission." Its trigger is a completed event: a positive credible-fear determination for an alien in expedited removal. *Lopez Garcia*'s construction of "seeking admission" is not relevant here.

Second, the facts are materially different. The *Lopez Garcia* petitioners entered without inspection in 1996 and 2005, respectively. Each lived in the United States for roughly two decades or more before ICE first encountered and detained them in the interior in October 2025. *Lopez Garcia*, 190 F.4th at 312–13. Nothing in the opinion indicates that either was processed in expedited removal, received a credible-fear determination, or was paroled. Petitioner, by contrast, was apprehended at or near the border shortly after crossing, processed in expedited removal, found to have a credible fear, and paroled under § 1182(d)(5)(A).

Third, *Lopez Garcia* itself treats the two categories differently. The majority described noncitizens paroled during expedited removal as subject to mandatory detention without bond. *Id.* at 329. It also recognized that "[p]arole creates its own legal fiction": a paroled noncitizen is not considered admitted and is treated as if stopped at the border. *Id.* at 319 n.5 (citing *Thuraissigiam*, 591 U.S. at 139). Its holding is framed around noncitizens "like the [p]etitioners," who were present without being admitted or paroled. *See id.* at 318–19.

At the hearing, the Court asked Respondents what statute would apply if Petitioner had entered without inspection, had never been apprehended or paroled, and had been found in the interior three years later. Respondents acknowledged that a different statute would then apply—a conclusion consistent with *Lopez Garcia*. This highlights the limits of today's ruling: that a noncitizen who was apprehended shortly after crossing, processed in expedited removal, found to have a credible fear, and

paroled from that custody returns to that custody under § 1225(b)(1)(B)(ii) when the parole ends.

#### 4. *Contrary district court decisions*

Petitioner cites some twenty-six district court decisions within this Circuit that have granted relief to noncitizens previously released from immigration custody. The Court has examined those decisions. They do not bind this Court, however, and reasonable jurists have interpreted this statutory scheme differently. On the facts presented here, this Court reads § 1182(d)(5)(A)'s declaration that parole "shall not be regarded as an admission," its return-to-custody command, and the Supreme Court's construction of § 1225(b) in *Jennings* to require a different result.

The Court recognizes the intuition that a bond hearing may be a modest form of relief. But whether noncitizens in Petitioner's position should receive bond hearings is a question Congress has already answered in §§ 1225(b)(1)(B)(ii) and 1182(d)(5)(A). The Court must apply that answer.

Petitioner's argument that § 1226(a) governs Petitioner's detention fails.

### C. Due Process

Petitioner further asserts that regardless of which statute applies, the Fifth Amendment forbids Petitioner's re-detention without an individualized determination of flight risk and danger. Petitioner argues that Petitioner is due more process than what Congress has provided by statute. Respondents contend that, as an applicant for admission treated as if stopped at the border, Petitioner is entitled only to the process the statute affords.

*1. The text and its original understanding*

The Fifth Amendment's Due Process clause provides that no "person" shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The word is "person," not "citizen." Petitioner is a person protected by the Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The question is what process is "due" to a person in Petitioner's legal position.

The Supreme Court answered that question at the outset of federal immigration regulation, and it did so by reference to principles of sovereignty understood at the Founding. "It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). As to aliens not yet admitted, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Id.* at 660. The Court has adhered to that understanding for more than a century. *Thuraissigiam*, 591 U.S. at 138–39. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *accord Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

*2. The entry fiction applies to Petitioner*

The decisive question is whether Petitioner is treated in law as still at the border or as having entered the interior. Binding precedent holds that it is the former.

In *Thuraissigiam*, the respondent was apprehended about 25 yards inside the border. 591 U.S. at 107. The Court held that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'" for due process purposes. *Id.* at 140 (quoting *Zadvydas*, 533 U.S. at 693). Such an alien "has only those rights regarding admission that Congress has provided by statute." *Id.* Petitioner was apprehended at or near the border only a matter of hours after crossing, according to Petitioner, but at most about two days after crossing. On this point, Petitioner's position is materially indistinguishable from the respondent's in *Thuraissigiam*. Petitioner's argument—that the entry fiction is limited to "arriving aliens" who are apprehended at the moment of entry—cannot be squared with *Thuraissigiam*, which applied the principle to a person who had already crossed the border. This rule, the Supreme Court explained, would be meaningless if it ceased to operate the moment an alien set foot on U.S. soil. *See id.* at 139–40.

Moreover, parole does not change that status. The Supreme Court has long held that parole does not effect an entry. *Leng May Ma v. Barber*, 357 U.S. 185, 188–90 (1958). It has reaffirmed that aliens "paroled elsewhere in the country for years pending removal . . . are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (first quoting *Mezei*, 345 U.S. at 215, then citing *Leng May Ma*, 357 U.S. at 188–190, and *Kaplan v. Tod*, 267 U.S. 228, 230–231

(1925)). Congress codified the same rule: parole "shall not be regarded as an admission." 8 U.S.C. § 1182(d)(5)(A). The Fourth Circuit recognized the same principle in *Lopez Garcia*. 190 F.4th at 319 n.5.

Petitioner relies on *Mezei*'s observation that "aliens who have once passed through our gates, even illegally," are entitled to due process in expulsion proceedings. 345 U.S. at 212. *Thuraissigiam*, however, makes clear who has passed through the gates in the relevant sense. 591 U.S. at 139–140. An alien apprehended shortly after an unlawful crossing, and then paroled, has not.

Petitioner argues that *Thuraissigiam* is inapplicable because it concerned the procedures for admission, not detention. That is accurate as to the specific claim decided in that case. But the rule *Thuraissigiam* applied is not so limited. That rule, that an alien seeking initial entry has only those rights regarding admission that Congress has provided by statute, came from *Knauff* and *Mezei*. And *Mezei* applied it to detention: the Court rejected a due process challenge to the continued detention, without a hearing, of an alien held at Ellis Island. 345 U.S. at 212–16. The rule, therefore, reaches detention as well as admission procedures. In any event, detention under § 1225(b)(1)(B)(ii) is itself part of the admission process. Its stated purpose is "further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). A lower court may not limit a rule the Supreme Court has repeatedly articulated in general terms to the specific facts of its latest application.

### *3. Petitioner's re-detention theory*

Petitioner maintains that the 2023 release created an implicit promise that Petitioner's liberty would be revoked only upon a violation of its conditions, and that re-detention therefore required notice and a hearing. Petitioner draws that theory from *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), and asks the Court to weigh it under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

*Morrissey* concerned the revocation of criminal parole for persons who had been convicted within, and were indisputably part of, the domestic legal community. *See, e.g., Morrissey*, 408 U.S. at 482–84. It did not involve immigration parole, which § 1182(d)(5)(A) declares is not an admission. The terms of Petitioner's humanitarian parole did not promise indefinite liberty. The parole document stated that parole could be terminated at any time, and the parole carried a one-year expiration date that passed in June 2024. A grant that by its terms expires creates no promise that it will continue. And where, as here, the Supreme Court has held that the process due to an alien in Petitioner's position is the process Congress has provided, a court may not substitute an interest-balancing test for that rule. The Court therefore does not reach the *Mathews* factors.

The process Congress has provided has been afforded. Petitioner received a credible-fear interview and a positive determination. Petitioner was placed in full removal proceedings and is pursuing asylum there before an immigration judge with a right of appeal to the Board of Immigration Appeals. The statute also provides a

discretionary mechanism for release through humanitarian parole, which the Court addresses in Part III.D below.

#### 4. *Limits of the Court's determination*

The Court's ruling is limited to the present record. Petitioner has been detained for 49 days. Petitioner does not claim that the detention has become unreasonably prolonged, and that question is not ripe. *Jennings* expressly left open whether the Constitution limits the length of detention under § 1225(b), 583 U.S. at 312, and this Court does not decide it. At the hearing, Respondents took the position that the Constitution would require nothing more, even if an applicant were detained for decades while an asylum application was adjudicated. The Court does not adopt that position. Nothing in this Order necessarily forecloses a future Constitutional claim. On the present record, however, Petitioner's due process claim fails.

### D. Available Avenue for Relief

The Court has reviewed Petitioner's declarations and the record with care. The Court takes seriously what Petitioner has suffered and has concern for Petitioner's situation. Respondents' own investigation substantiated that Petitioner was sexually assaulted by another detainee on October 26 and 27, 2026. The record also reflects the persecution in Guatemala, the threats Petitioner faced in detention in 2023, and the anxiety, depression, and thoughts of self-harm Petitioner now reports. No part of this Order should be read to minimize those harms.

The record also reflects that, after Petitioner reported the assault, the authorities provided a medical evaluation, information under the Prison Rape

Elimination Act, and mental health services and evaluation. They placed the perpetrator in administrative segregation and then transferred the perpetrator to another facility. They investigated and substantiated the report. Protective custody has been offered and remains available according to Respondents. (Doc. No. 14-4 ¶¶ 14–19). The Court acknowledges Petitioner's concern that protective custody would mean isolation, which in 2023 preceded serious mental health challenges for Petitioner. The Court expresses no view on the sufficiency of the authorities' response, and Respondents remain obligated to protect detainees in their custody.

The Court is nevertheless bound by the law and the facts of this case. Congress has mandated Petitioner's detention under § 1225(b)(1)(B)(ii), and the Constitution, as construed by the Supreme Court, affords no more process than Congress has provided in this posture. The Court therefore lacks a lawful basis to order Petitioner's release or to order a bond hearing.

Congress did provide a mechanism for temporary release from § 1225(b) custody: humanitarian parole under § 1182(d)(5)(A), available "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also Jennings*, 583 U.S. at 300. The implementing regulation contemplates parole for persons with serious medical conditions, for example, and in other humanitarian circumstances. *See* 8 C.F.R. § 212.5(b). Respondents found Petitioner suitable for humanitarian parole in 2023, and the record reflects Petitioner's full compliance with the parole conditions as well as recent serious hardships while detained.

The decision whether to grant parole is committed by statute to the Secretary's discretion. The Court expresses no view on how that discretion should be exercised. The Court expects that any such request will receive prompt and careful consideration.

## IV. CONCLUSION

Petitioner's request for relief fails as a matter of law. Nothing in this Order precludes Petitioner from requesting humanitarian parole from DHS under 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5.

**IT IS, THEREFORE, ORDERED** that:

1. The Petition (Doc. No. 1) is **DENIED**;
2. Petitioner's Emergency Motion for Temporary Restraining Order/Preliminary Injunction (Doc. No. 10) is **DENIED AS MOOT**;
3. This matter is **DISMISSED**; and
4. The Clerk is directed to close this case.

**SO ORDERED.**

Signed: November 25, 2026

Matthew E. Orso
United States District Judge